Good morning, Mr. Carr. Good morning, Your Honors. Your Honors, we have a—should I begin? Of course. Your Honor, we have—could you state your name for the record, please? My name is Jason Carr from the law firm of Hoffman and Tomczyk. I represent Mr. Larry McDaniel. Your Honors, this is a joint argument. I intend to argue for nine minutes, reserve one minute of my time for rebuttal. My co-counsel will have nine minutes and one minute for rebuttal, and I will watch my time carefully. So you're representing McDaniel? Yes, Larry McDaniel. All right. Your Honors, it has been said sometimes that oral arguments can be dull, but this case is anything but dull. We have retinal scans. We have the remains of bodies. We have this vault that was used by shady characters, people who, in the best case scenario, were trying to avoid having their assets garnished in civil proceedings, outright criminals. I mean, the testimony from the bankruptcy trustee is fascinating in this case when he talked about what this vault entailed. But there's three things in this case that I want to leave the Court with, three A's. So the first A is audio. The audio tape, the newly discovered evidence, the audio tape, it's important, it's crucial, the physical copy is before the Court, and I would encourage you to listen to it because it's powerful. And part of the issue, one of the major issues in this case is would Mr. McDaniel be entitled to a new trial based on this newly discovered evidence? Let me tell you, as a defense attorney, with that audio tape, that's dynamite. Mr. Carr, I want you to mention the other two things, but with the audio, I'm a little skeptical of it. It's up, I guess, in a garage. There's nothing authenticated that it's Mr. Shakin on the audio. I think the expert only testified to that it hadn't been tampered with, but there's no testimony that this is the owner on the audio. So why do you think it's such a blockbuster piece of evidence? Well, there's different issues, right? And unlike the letter... I'll just say, overall, some of my skepticism with this is how trustworthy is this new evidence as a whole, and how much is it corroborated if we're looking at the district court's decision under an abuse of discretion standard? Which gets to the authenticity, which is the third A, but your questions are excellent. So the audio tape, the problem with the audio tape is not immiscibility, because we know if I put, if I get a new trial, I put Mr. McDaniel on the stand, I don't know any way they can stop me from talking about this tape. I can use them to authenticate it, I can use them, I can cross-examine him on it, so immiscibility is not a problem with the tape. Authenticity. Well, the tape, first of all, is a newly discovered, which is embedded in your Honor's question. Well, the tape was made when Mr. McDaniel came to, when it came to his attention that the tape was important, he looked for it, he looked in his house, everything, this was back in 2012. But he made the tape, right? He made the tape, yes. So he knew it existed. That's not an issue. So he, when the tape... But he didn't realize it was important? Not when he made it. No, not when he made it. When he first made it, he thought it was just like my employers badgering me and harassing me and trying to make me work under inappropriate circumstances. It wasn't a criminal investigation at that stage. But anyways, the tape, he went, so it was just a couple weeks later, the robbery occurs at 24-7, cops are involved, they talk to Mr. McDaniel, he's like, I've got to find this tape. And he looks, he's in the house, he can't find it, he asks his mother, who he's lived with his entire life, and she says I threw it out. And he's devastated. Now, the first question, one of the court's questions is, and one thing the district court looked at is, he didn't tell the cops. Well, good. I'm glad he didn't tell the cops. He did exactly what every criminal defendant should do, which is not give the cops too much information. Did he tell other people about the tape? Well, yes, he did. I mean, he told his attorneys, he told a lot of other people about the tapes, he just didn't tell the cops. That's his constitutional right. He told the cops other things. There was that polygraph, right, which didn't come into the trial, but he did divulge other things to the cops. So why not that? There's no question that this was a custodial interrogation situation, but he did have some communication with the cops. But he did not tell them everything. And he did, in fact, it was, in his mind, important, as he says in his declaration, to find this tape because to see what was actually on it, what did it actually record. Because when you look at the actual report about the tape, it's literally in the middle of audio. Like, it was an audio tape that he pressed record on because the thing was sitting on his table, like one of those old tape recorders, little black box. And it recorded over the audio this conversation he had with Mr. Shakin. So is the tape authentic? Well, it was newly discovered. Well, one thing that the district court implied that he just found in his garage is not exactly what happened. I mean, first of all, in 2012, he looks for it. He looks all over his house. His mother throws it, tells him, oh, I threw that out. It was my tape. I didn't know you needed it. Then his mother dies. And he's not been charged with the crime. His mother dies in 2015. He is not indicted in 2020. So in 2020, eventually, after his trial, he's like, oh, got to liquidate. I've been convicted. He gets the stuff out of the storage and starts going through it. Takes a bunch of DVD movies to the store, a store to sell them to make money. And my co-counsel, she actually has a surveillance tape where he finds the tape again for the first time in 2021. So one of the legal questions that's embedded in your question here, I mean, mostly the standard here is abuse of discretion, but there is a legal question here that's review de novo, and that is, can evidence be newly discovered if it's been lost? In other words, the government says in their briefs that this was possessed, that Mr. McDaniel possessed this tape even though he had no idea where it was for a period of nine years. But even let's set aside that it is newly discovered. How do you overcome the obstacle of how reliable is it when you don't have evidence that the owner is on the tape? I mean, you'd have, I guess, if Mr. McDaniel decided to testify, you could have his testimony, but how else? Why would it move the needle in order to overcome an abuse of discretion standard? Well, you're filtering down to the crux of this case. The crux of this case regarding both the letter and the tape is, is it real? Is it real? Because if it's real, it's dynamite. It's powerful. So how do we know the tape is real? There are five known audio samples of shaken included in the presentation to the district court and to the physical exhibit that was provided to this court. Known audio samples of Mr. Shaken. You can listen to his voice and compare it to the samples. He has a very distinct voice, which is why I would encourage you to do that. But you had an expert, you had a handwriting expert for the, for the letters. Yes. But there was no corresponding expert matching these audio recordings from Shaken to, to this audio. Well, I agree with you to the extent that the expert for the letter was very well, 40 years of experience in law enforcement, very credentialed, very detailed report. The expert report regarding the letter is very high caliber, high quality. We do have an expert report for the audio, which you could say is not as detailed, but we do have an expert report. And here's the thing about this case. There's no mis, allegation of misconduct in this case, but the government, if I was going to fault them for anything, it would be callousness. And why do I say that? Because there's two possibilities for this tape and this letter. One is that they're fabrications and they shouldn't be admitted because they aren't real. The second is that they're real and it strongly indicates that my client is innocent. Now why is the government not concerned with either of those possibilities? Because especially with this letter, they had every opportunity that we had to get an expert to look at it because we knew as a defense, even though I wasn't even on the case yet, we knew as a defense that the key issue here, is it real? And we did everything we possibly could. Mr. Rasmussen just really did an excellent job overturning every rock to try to prove this is real. We got an expert report. This is his writing. We have all these corroborating circumstances. The tape and the letter, they fit together like a glove. There's evidence in the letter that nobody could have known if they didn't know about the case. There's all these factors that support authenticity. The most important factors, of course, is that we have reports that say the tape is what it reports to be. And some of these are jury questions, right? Like once the government, and they said in their answering brief, we're going to attack this evidence if it comes in. You should. Because some of these are definitely jury considerations. How much weight to give the deathbed confession? How much weight to give the tapes? But it's not a question of invisibility because this evidence is authentic It's potent. It's powerful. And it should be admitted. And all we're asking for is a new trial. The appearance of justice in this case demands that. Because this conviction cannot be declared sound without this evidence being heard by a jury. I have 47 minutes left. I'd like to reserve that. Well, you only got to one A, so we only got to the audio tape. Could you just tell us what the other two A's were that you wanted to say? Oh, yes. Very good. Just name them. Just name them. Audio. Admissibility. Authenticity. Admissibility. Does the evidence have to be admissible? We submit it doesn't. Authenticity. We submit there's a lot of evidence of authenticity, and that's the key issue. Got it. I guess we got to them eventually. Thank you very much. Okay. Thank you. We'll give you a minute for rebuttal. I appreciate that. Thank you. Good morning, Mr. McMaster. Good morning. Good to see you. Good to see you. And my esteemed colleagues. I am Lisa Rasmussen, and I have the honor of representing Sylvia Whitmore in this case. But it's an honor, but I have to confess to you, it's also kind of terrorizing to me because it is not often that we represent a client where we so wholeheartedly believe that she's utterly innocent of these crimes. And it's not what I believe. I mean, let's talk about the facts, but this is really a very unique case, and I've never seen anything like it in my 25 plus years of practice. So first, and I want to just kind of pick up on some of the things that Mr. Carr was talking about. I think it's important to remember when we're talking about in particular the audio tape, that these defendants were not charged until five years after the robbery occurred. That was April 2012. And they're indicted and it's sealed in 2017, and then they get arrested sometime in June. And the reason for that is because my client, Ms. Whitmore, was consulted in a published opinion by this court, and that case is lit with. Why is that relevant? Well, I think the government did not charge her until that other trial was finished. So I'm just pointing out there's a very long period of time before they know that they're being charged with a crime, any crime. So one of the things that I want to talk about is not only do you have on that physical exhibit that was transmitted the known samples of Shaken, they're from court proceedings. They're from court proceedings and you can tell from the context, and there are five or six excerpts of his voice. And when you listen to them, I don't believe that there's any doubt that that's his voice. It is the same as the audio tape. But I think to your question, Judge Sanchez, that you're asking is if it was so important, why didn't he look for it and find it? He didn't believe it to exist. His mom had dementia. He believed that she had thrown it away. But let's talk about the letter. So are you saying he just stumbled across it? He did, yeah. They were cleaning out. She died in 2015. They put boxes in storage. After the jury trial, they were going through boxes. They cleared out the storage. And that's one of the exhibits that you have, the receipt from when they cleaned out the storage and cleared it out. It's an exhibit to the motion for new trial. And then they were going through the boxes and they found like DVDs that they just decided they were going to take to see a record and sell. And that's why I went and got the video, because they kind of told me they found this audio tape. They didn't know what was on it. He didn't even have a means to play it. He had to order online. I guess, Ms. Rasmussen, let me ask you the same question. You are both emphasizing the audio tape, which is interesting to me. Why not have an expert put forward in the same way that you did with the handwriting expert to say, based on my expert analysis, this is shaken, this is Elliot shaken on the audio? I think the short answer is I didn't think it necessary, because when you listen to the own samples of shaken's voice, it's so clearly him. He does have a unique voice. He's an elderly gentleman. He died in his late 80s. I don't, I mean, to me it's so clearly him. I think that any juror would conclude that. And you don't have to trust me, certainly. But then why not apply the same logic to the handwriting? You leave it to the juror to decide if they match. Perhaps an inefficacy of my advocacy. Again, this case is terrifying to me, right? Like I'm trying to do every, to just cover every base. Like they're going to wonder how he just found this. So I went to Zia Record and asked for the surveillance audio. I submitted the receipt. All of that's in the record. But to me it's so clearly him. And I don't, and I think you're right. Can I ask you this? You know, one of the standards for newly discovered evidence is that even if you got into trial, there would be a probability of acquittal. Why do you think that there's a probability of acquittal with, you know, with the evidence of the handwriting, you know, of the letter and potentially the audio as well? Yes. In view of, you know, these suspicious bank deposits at different times, you know, somewhat questionable explanations for them. And at least in Ms. Whitmore's case, you know, her admission of the prior robbery. Well, I disagree that it's an admission of a prior robbery, but I'll get to that. The, I think the letter is actually the most important thing because it's a complete confession from Elliot Shakin. He says he's writing it as he's dying. He also, not only does he explain that he and her base did both the, he calls them both robberies, but that's a common mistake. One is a robbery, one is a burglary. Not only does he say that he and Phil did both of those, he says the employees were not involved. It completely exculpates both of them. And then he even adds that Phil wants to call Crime Tip or Crime Stoppers is what we call it in Nevada and blame the employees, and he says they were not involved. And he says things in that letter that no one else making that letter up, like, let's just say, okay, and Mr. Carr is right. If the letter is not real, then it's a forgery, right? But who else would write the derogatory comments about police, police are stupid, and F-U-C-K, the trustee Shapiro. And he, like, that's only Shakin. Nobody making that letter up would add those comments. So you have this authenticity that's sort of built in, and I think that there's several factors that you can look at in the record that establish these things. There is a Crime Stopper tip that is made. There's audio tape kind of supports the letter, right? And there's no victims from the 24-12 burglary event. No one ever came forward and said they were missing anything. The trustee worked to reunite people with some of their box contents, but nobody ever came forward and said that they were missing anything, which supports what he says in the confession, that he put the money in the L-boxes, and this is what the trustee testified to, too. He came in. It was not friendly. He basically told him, what are you doing running your business? You filed bankruptcy, Chapter 7. You can't be here, and he kicked him out, and he literally walked out with his lunch. But he also, Shakin, in the civil proceedings says, I didn't get what I wanted that day. He says that, and the confession letter supports that, and then the burglary happens right after that. So it's clear to me that Shakin would take money from abandoned boxes or where people hadn't paid the rent. He would set it into a different place, the L-boxes, and then that would become his at some point, and then the trustee comes in, kicks him out, says, what are you doing here? You filed bankruptcy. You're not supposed to be running your business. He's surprised by that, and the trustee testified to that, and then all of a sudden, there's a burglary between January 31st, 2014 and February 4th on the day the trustee comes back, and no one is missing anything. So it's this abandoned... You said the lack of victim supports this. It's corroboration, but was there any evidence that the money or whatever was found in those L-boxes was reunited with anyone? So there's money missing because that's part of the burglary event in 2014. The trustee's testimony was that he was able to reunite some money with some people, and then the rest of it, he turned over to the state of Nevada as abandoned property. Is there anything that shows that what was in the L-boxes was matched with individuals who had... No. We don't know what was in the L-boxes. I think this was shaken scheme. I mean, he testified at his 341 hearing under oath that he lost $2 million over the kind of, I think, 18-year span that he had the business, didn't make any money on the place. Is there anything that makes that inherently credible? To me, it all authenticates itself. I mean, if he lost money, but at the same time he's stealing and setting aside this money, I'm not sure that that seems persuasive. He's making conflicting statements, unless he never took anything and was only going to take it at the very end. I don't agree that he's making conflicting statements. I see I'm really close on my time, and I know I wanted to go back and answer... I hope I answered your question, Judge Gibbs. I wanted to go back and talk about the fact that there was a prior robbery with my client. There was not. Her base came in, plopped money down. That was New Year's Eve, 2009. She brought it back the next morning. That's all documented. It's all in the exhibits to the motion for new trial. Can I ask you... Yes. I think we'll give you a little extra time if need be, but why would this declaration from Ms. Whitmore come out post-trial when there's already been a challenge to the statements made to this special agent? In other words, the entire basis for the trial objection was that these are too dissimilar, that it shouldn't come in. Why wouldn't... If, in fact, she never made these statements to the agent, why wouldn't it have come in earlier during trial? It's a good question. I didn't do the trial. I was retained after the conviction, and right before the tota roba letter, the confession letter of Shakin, hit the docket. I don't know what trial counsel's strategy was. I think that they just thought there's no evidence either of these people were involved in either the robbery or the burglary, and that their clients would be acquitted. There isn't any evidence that they were involved in those. The government's theory was follow the money they made deposits, and I could go on and on about that. We live in Las Vegas. They have elderly parents who hoarded cash, part of it's cultural, part of it's religious. They're LDS. A lot of the people that put money in the vaults were Mormons from Utah. I could go on and on about that, but I'm out of time, and I've run out of good grace here before you, and I'd appreciate maybe just a brief moment to say something at the end. Yes, I'll give you a minute for rebuttal. We took your... We helped you to go over to your... Thank you so much. I appreciate it. We'll hear from the government. May it please the Court. My name is Mina Chang, and I represent the United States. As the Supreme Court and this Court have repeatedly noted, defendants do not have a constitutional right to introduce any evidence that they believe to be relevant. And in this case, the district court, which has become very familiar with this case over the course of seven years, may correct evidentiary rulings. First, by properly determining that the evidence would be inadmissible and excludable when they were irrelevant or from sources that were unverified, unreliable, and unavailable. Second, when necessary, the district court properly limited the use of other admissible evidence, such as 404B material, and accordingly instructed the jury. It seems that the court is most interested on the allegedly newly discovered evidence, so I'll focus on that topic. While the defense has urged that this purported confession letter and the tape are unique, once-in-a-lifetime circumstances, when you view this in the light of the whole case, the confession letter and the tape are actually quite in character with the defendant's many, many other purported once-in-a-lifetime discoveries that have come up in this case. For example, the defendants find hundreds of thousands of dollars in pillows and mattresses, not once but twice, from deceased parents. A quarter of a million dollars is handed to Mitt Ware for no reason, and then she gives it back to an unnamed Moran man. McDaniel's now-deceased father sells a $390,000 violin in cash to a foreign Irishman. Whitmore receives $269,000 from her father nine years after his death, of which the executor of his estate has no idea about. And again, what is common about all these instances, including the purported confession letter and the tape, is that the declarants to all the serendipitously discovered evidence are unavailable, whether that by being deceased, unnamed, untraceable, or otherwise unidentified. Well, Ms. Cheng, let me ask you this. Did the district court make a mistake when it considered the handwriting analysis and only focused on one piece of writing, when the expert's report actually covered quite a few more things? No, Your Honor. So the district court expressed doubt about whether the methodology of this expert witness was proper, and that was fully within the discretion of the district court. What happened was there's a mischaracterization of evidence which the district court noted. The expert, the handwriting expert, had used a document that was enclosed with this Toda Raba letter and categorized that as a known shaken sample, when it really should have been unknown because it wasn't verified. But even if there was a reason to question that one, the expert also looked at many other writing samples that the court didn't address. So is there a problem there? No, because the district court, in fact, made multiple findings. It was not only that this, that the district court had skepticism about this expert witness's conclusions, but moreover, the district court found questionable authenticity about where the corroborating evidence, about where this letter came from. And moreover, the district court found that aside from the fact that whether or not Shakin wrote this letter, there was a lack of corroborating circumstances regarding the reliability, the contents of the Shakin letter. And on top of that, the district court explicitly stated that its decision was not hinging on the admissibility of this newly discovered evidence, because even if this evidence had been admitted at trial, there's so much overwhelming evidence against Whitmore and McDaniel that it wouldn't have made a difference. Let's talk, I mean, why is it overwhelming? It seems to me as if there's scant evidence on both ends of things. There's not much evidence to corroborate the letter, but there's also not a great deal of evidence to corroborate the robbery itself, other than the deposits of banks, particularly from Mr. McDaniel, because, Ms. Whitmore, there was also the admitted, the statements coming in about prior thefts. What else made this, why do you characterize this as overwhelming evidence in your view? Yes, Your Honor. Because the government's theory was not that McDaniel and Whitmore necessarily drilled into the vaults. So if you actually see McDaniel's convictions, they relate to interstate transportation of stolen property. So even if McDaniel wasn't the one directly drilling into these vaults, what is key here is that he's moving large amounts of cash that are unexplained. He's giving, providing unexplained or bizarre explanations for where he's finding this cash. So in that way, it's overwhelming evidence. He's making $25,000 per year at a maximum. And literally a day after the 2014 break-in, he then brings hundreds of thousands of dollars of cash to a bank to deposit. So in that way, this is overwhelming evidence of McDaniel's guilt as it relates to his convictions. And so in your view, even if the letter comes in or even the audio, that would not be enough to think of this as probable acquittal? Yes, Your Honor. And the district court had wide discretion. An owner that's confessing to the thefts with another, with one of the co-defendants and saying the employees have no role in it, that wouldn't move the needle? No, because it was so suspect. You have an unreliable letter, questionable authenticity. You also have the defendants providing bizarre explanations for where they came across the cash that they're depositing. So all in all, the district court exercised its wide discretion in determining that in light of all this evidence, that the jury would have questioned this evidence. How does the watch play into that? So the watch is an incredibly specific item because it had a serial number, and that linked the watch to the defendants, including her base. Would Your Honor like me to discuss 404B or severance issues regarding the watch? The watch as far as Judge Sanchez's issue about whether or not, whether the note came in, if the note were to come in, whether it would be a different result? No, Your Honor, because in this case, the note and the letter show that Philip, her base was a participant in this robbery. But again, there's nothing that this letter or this tape notes specifically that Whitmore was not involved, that Whitmore didn't give her base this watch. I actually do want to ask you about severance, and I think the related claim is the inability to present a complete defense. So both Ms. Whitmore and Mr. Her base were moving to sever trials from each other, and then that motion was renewed. I understand the government's position that that was waived, but let's assume it isn't waived for the moment, that it was properly presented. Why wouldn't it be a problem? Does it not present a problem to have Mr. Her base present his daughter as a witness to say, this watch came from Ms. Whitmore, and she can't rebut it by bringing in, I think it was Special Agent Wade, if memory serves? Why isn't there a problem with that? Your Honor, these defenses aren't so irreconcilable as to be mutually exclusive. So the magistrate judge noted in its order in denying severance that Whitmore and her base could deny culpability. They didn't have to be involved in the 2012 robberies to each explain the possession of this purportedly stolen property, specifically the watch. And additionally, there are cases, for example, Throckmorton, in which a co-defendant testified that he and another co-defendant had both trafficked drugs, but he was acting as an co-defendant. And even that was insufficient to warrant severance, even though the defense squarely blamed the appealing co-defendant. And this is all because a core defense does not preclude acquittal of one person or the other. So I understand that, so then, even if there wasn't severance, is there a separate constitutional problem with not allowing Ms. Whitmore to bring in a rebuttal witness on this issue that was, I guess, implicating Fourth Amendment rights for Mr. Her base? No, Your Honor, because this was actually an ancillary point. The testimony of Special Agent Jarrett Wade was ancillary hearsay, and this was specifically to address an impeachment issue, to impeach the testimony. And so the district court actually walked through this issue pretty well. And so this is, just one moment, Your Honor. Essentially walking through that this was improper impeachment evidence. So specifically, Whitmore's counsel was attempting to call the Special Agent in order to impeach the recollection of somebody else. But again, this is just impeachment evidence. And Jarrett Wade's testimony would have been about un-Mirandized statements, and that would have been subject to the exclusionary rule. But all in all, to answer Your Honor's question, no, because Whitmore's counsel had the full opportunity to cross-examine Nicole Gaudioso about the origins of the watch, what type of watch it was, and Whitmore's counsel chose not to do that. She had full opportunity to examine what type of watch it was. And so in that way, it was not a violation of her Sixth Amendment rights. And the testimony was just about a watch and not a particular watch? Yes, Your Honor. There is no testimony that was elicited regarding what type of watch it was, where that watch came from, any description about the watch. So it was about a watch and not the watch. What about the jurisdictional element supporting, I think it's, I guess, the Interstate Commerce for the Hobbs Act? As I understand it, the government is resting on the notion that the watch was sold in Georgia but acquired in California. Does the, is there any evidence that Whitmore was involved in the sale of the watch in Georgia? Is that, is that needed in order to establish a jurisdictional element? No, Your Honor. And more specifically, the government's basis for this is not that the watch was purchased in California, but that the watch was transported first from 24-7, where it was stored in the vault, then taken to California, where Philip Herbace was, and then mailed back to Georgia, to the consignment store that was located in Georgia. And in that way, it affected interstate commerce. But back to Your Honor's original question, no. The Ninth Circuit model jury instructions make clear that it's not necessary for the government to prove that the defendant intended to or the defendant's conduct itself would affect commerce, but only that the natural consequences of that conduct affected commerce in some way. And in this case, there was a Hobbs Act robbery. There was jewelry that was stolen, and then it was foreseeable that this jewelry would then be transported across State lines to be fenced. But I so I I understand that would apply for Mr. Herbace, since he's has his fingers on this on the on the interstate qualities of it. Is it the fact that Ms. Whitmore was convicted of conspiracy that hooks her into that jurisdictional element or or no? Yes, Your Honor. In terms of conspiracy, she was involved in the Hobbs Act robbery, and it was a foreseeable conduct that jewelry or items stolen from the robbery would then be transported across State lines. I see. OK. So at the end of the day, your view is with the newly discovered evidence. What do you think is the district court's strongest position that it wouldn't have been admitted in a new trial or that even if it were admitted, it would not be a probable result in acquittal? Your Honor, I think that fundamentally, the district court expects extreme skepticism about the reliability and the authenticity of this evidence. In addition, there was so much evidence that the district court reviewed about the trial itself. So I suppose in this case, while the government would advocate that both prongs are equally important, the government would say that this evidence is so unreliable and so untrustworthy that it would not have made a difference anyway at trial. Unless your honors have any other further questions, the government would submit. Here's not. Thank you, counsel. Thank you, Your Honor's rebuttal. Let's have two minutes since the government ceded some time. Well, thank you, Your Honors. I wanted to address the weight of the evidence in this case. This case was about money. The government's opening said that the client, you just follow the money. And it is true that the most damning evidence in this case are the timings of the deposits. So the audio tape, which I keep talking about the importance of, the importance of the audio tape is not just that it shows my client declining to engage in sin with Mr. Schenken and declining his invitation to join this conspiracy. But the reason for it, he says, I do not need to do this because I have plenty of money and plenty of gold. And he says this in 2010 before any of the incidents at 24-7 vaults, the revised rule 804 for prior for statements against interest, the revised rule tells the courts unequivocally that you must look at all the evidence you can to see to get to the reliability, authenticity of the newly discovered evidence. So Judge Sanchez asked about why is there all this evidence that was supported? This could have been presented at trial. It's not all the newly discovered. We do that because the rule says we have to do that to prove that the newly discovered evidence in two pieces is authentic and non-dubious. And what is one of those pieces of evidence that we presented? 989, volume five of my excerpts of record. It's a private vaults memorandum which showed that my client had $765,000 in cash and 60 gold coins in a box at that vault in 2006. So follow the money, the government says. Well, you follow the money and it shows that my client had ample funds to make these deposits. The only real evidence against my client. Secondly, there was questions about the expert for the audio tape. I will note, and we didn't brief this. I'm going to be happy to do supplemental briefing on this, but in trials, say in bank robberies and such, lay people commonly get on the stand and testify looking at surveillance videos. Yes, that's the defendant. This is the same kind of exercise you'd be asking a jury to. Listen to these tapes, listen to the known audio sample. You make the determination whether you think that's Eliot Schenken. So it's not, it's a common jury determination. And admissibility, the last point I want to make, we believe this evidence is admissible under 804, it's admissible under 807, it's admissible under the somewhat unplowed land of constitutional overlay protection. But it doesn't need to be admissible because what this evidence, even if it's not admissible, it completely changes the trial because it retextualizes the government's evidence. It refutes the government's evidence and it recharacterizes the government's evidence. So even if neither of these two pieces of evidence are admissible, it would completely change the trial. The tape is clearly admissible anyways. But I'm just saying this evidence is so powerful, it doesn't need to be admissible because it would change the trial. And I'll just leave you with this, the Toto Rasa letter, the cover letter on excerpts of Record 902. This is the letter that was sent to the court that contained Eliot Schenken's confession. This is the cover letter. And in it, the person talks about how they're doing this because they read about it on the news. They have this, they had this deathbed confession. They know what the truth is. They don't want to be involved. But they write the court and say, look at this letter. Make the story right, please. What happened here is wrong. Court, do the moral thing. All right. Thank you. Counsel? Ms. Rasmussen? Thank you, Your Honor. Three things. The severance was renewed. But it really goes and at trial, and I commented on this I think in both of my briefs, Herbace's lawyer became the prosecutor of my client. And that is an untenable situation. But now, with the letter, the confession letter of Schenken, it changes that even more, right? The letter, if you're attaching the letter to a severance motion, and Herbace is out of this because he waived his appeal for some reason and is now filing crazy things in the district court, accusing the district court judge of having a vault and nonsense. But there is no doubt that had the court had the severance letter, which granted the district court didn't, or the confession letter, he would have had to grant severance, right? I mean, the letter so fundamentally changes everything. I don't concede that the letter is not admissible. In fact, I think that it is admissible. But even if for some reason it weren't, it changes the entire defense strategy of the case. But counsel, don't we look at the severability issue at the time it was made? We do. And so it was renewed during trial because what was happening was she couldn't put on a defense. She couldn't talk about the fact that Herbace came and plopped $250,000 on 12-3109, and that she brought it back on 1-110 the very next day. And that there was she couldn't talk... Why couldn't she talk about that? Because it was prejudicial to him. But that doesn't mean she can't put it in. She can put it in if it's prejudicial to him. Just because they're co-defendants doesn't mean that she's precluded from putting in evidence that's prejudicial to the co-defendant. I think that Judge Gordon had ruled previously in the 404B litigation that that part of her polygraph and her discussion with Agent McKamey could not come in because it was prejudicial to Herbace. I think that was the district court's prior ruling. And then she couldn't talk about... They couldn't put the agent on... So was the district court reminded of that when the severability issue was renewed? Well, I have to go look at that part of the transcript, which is on day four, to see exactly what he said about it. But that's also where he was saying that they couldn't bring in the agent that they wanted to put on as the rebuttal witness. And that's the context of renewing the severance motion during trial. But it had nothing to do with the letter, though. That's the point. No. And where did Ms. Whitmore renew the request for severance? So it happens out of the presence of the jury conversation during trial. And I want to say it's day four of the trial transcript. Was it a defendant who did the renewal, or was it a different defendant? It may have been a different defendant. And I think that her lawyer joined. I think it was just that Mr. Herbace's lawyer renewed it, and he used the word we. And so there is some ambiguity as to the renewal. You may be right. But as to whether... But because there had been separately filed motions to sever beforehand, we can't construe the we as being a renewal that involves all of them. I think that's my understanding of the arguments. You may be right. And I, because I didn't do the trial, I'm at a little... Yeah. So the inability... I mean, the severance kind of goes, as we pointed out, to her inability to present a complete defense. But also, I just want to say, because I didn't really get to talk about it, this is our opportunity to really dive into the new advisory note, which was changed on 12-31-24, and to fill in that gray area on 8-04, on advisory note one. And that's exactly what the committee intended, to fill in that gray area between Donnelly and admissibility by looking at the totality of the circumstances. And that's why I believe the sentencing commission made the change to give courts that authority. And that is a substantial change. Donnelly has a lot less evidence than this of reliability. It's a spoken confession from Joe Dick that he shot Chickasaw, and then Joe Dick is dead. So, I mean, if you look at Donnelly compared to this, and I know it's a 1912 case and it goes on and on about waterways and Indian reservations, but it is fascinating because it's a lot less reliability and circumstantial evidence than we have here in this case. All right, counsel. Thank you. Thank you, counsel. Thank you to all counsel for your helpful arguments. The case just argued is submitted for a decision by the court. That completes our calendar for the
judges: RAWLINSON, SANCHEZ, Zipps